**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| BRITTANY BRUNO AND MICHAEL | § | |
| BRUNO, AS PARENTS/ | § | |
| GUARDIANS/ NEXT FRIEND OF | § | |
| R.B., and R.B. A MINOR | § | |
| INDIVIDUAL | § | |
| WITH A DISABILITY | § | **CIVIL ACTION NO. 5:17-CV-1129** |
| *Plaintiffs,* | § | |
| v. | § | |
| NORTHSIDE INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| *Defendants*. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Come now, Brittany Bruno and Michael Bruno as parents/guardians/next friends of R.B., a minor student with a disability, collectively termed Plaintiffs herein, by and through their attorneys, CUDDY LAW FIRM, PLLC., for their complaint and hereby allege:

1. This is an action brought pursuant to the civil action and fee-shifting provisions of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(i)(3).

2. Plaintiffs reside in the County of Bexar, State of Texas.

3. R.B. is a child with a disability as defined by the IDEA, 20 U.S.C. § 1401(3)(A).

4. Brittany Bruno (Mrs. B.) and Michael Bruno (Mr. B) are the parents of R.B. as defined by the IDEA, 20 U.S.C. § 1401(23).

5. Defendant Northside Independent School District ("NISD" or the "District") is a local education agency as defined by IDEA, 20 U.S.C. § 1401(19), and, as such, is obligated to provide educational and related programs and services to its students in compliance with the applicable federal and state statutes, regulations, and the U.S. Constitution, and is subject to the requirements of 20 U.S.C. § 1400 *et. seq.*, and the regulations promulgated thereunder.

1

## JURISDICTION AND VENUE

6. Jurisdiction is predicated upon 28 U.S.C. § 1331, which provides the district courts with original jurisdiction over all civil action arising under the laws of the United States, and upon the civil action provision of IDEA, 20 U.S.C. § 1415(i)(3)(A), which provides that the district courts of the United States shall have jurisdiction of actions brought under section 1415(i)(3) without regard to the amount in controversy.

7. Venue is predicated upon 28 U.S.C. § 1391(b)(1) based upon the residence of the plaintiffs and defendant, and upon 28 U.S.C. § 1391(b)(2) based upon the location of the defendant.

## FACTUAL BACKGROUND

8. R.B.'s family is a military family who were transferred to Texas in January of 2016. R.B. is eligible for special education as a child with Autism and a speech impairment.

9. R.B. attended Holland Elementary in Florida, where he was provided a full-day of school in the ESE classroom (Exceptional Student classroom). In Florida he had a weighted lap-pad, weighted vest, iPad, and headphones. R.B.'s private Board Certified Behavior Analyst (BCBA), Tara Hamilton, went to Holland Elementary two times a week and attended class, extracurricular activities, and Occupational Therapy (OT) and speech sessions. She provided guidance and input regarding behavior strategies to use with R.B.; however, these teachers would not be considered Applied Behavior Analyst (ABA) providers. R.B.'s OT provider also collaborated with the private ABA provider, R.B.'s teacher, and Mrs. B. R.B.'s providers recommended continued ABA and OT therapy upon moving. When R.B. left Florida, he was making progress on toileting. He independently completed all steps, but needed prompting to use the toilet. He could also hold

a pen or crayon in a digital pronate grasp and draw small circles using that grasp.

10. R.B. moved to the Northside Independent School District ("NISD" or "the District") and a transfer Admission, Review, and Dismissal (ARD meeting was held on 01/13/16. An ARD meeting is a meeting of parents and educators to discuss and develop an individualized educational program (IEP) for a special needs student. At the transfer ARD, Mrs. B. was told that R.B's IEP from Florida would not transfer to Texas, as it did not meet Texas standards. Rather, he was unilaterally placed in a self-contained classroom and his school day was reduced to half-day, even though a full-day program is available in NISD.

11. There is no documentation to support NISD's claim that R.B. received any speech therapy or OT during his first 30 days in NISD.

12. At the February ARD, Mrs. B. asked for Applied Behavioral Analysis (ABA) services, but the request was unilaterally refused without explanation. ABA therapy uses scientific, evidence-based treatments to change socially significant behaviors. These services are provided by a Board Certified Behavior Analyst (BCBA). ABA is an important technique for children with autism and has worked well for R.B. It is important for R.B. to receive ABA therapy at school and at home because it helps him to generalize skills across settings. Children with autism do not generalize behaviors the same way typically-developing children do. If a therapist could not provide services in both settings, it would be very important for the therapist to speak with the school's BCBA. This is important, as both providers would need complete and accurate knowledge of R.B.'s skills in different environments, and what strategies are successful with him, so that the providers could provide consistency between environments. Once a student is progressing with therapy, as R.B. is, ABA calls for generalization. Generalization is when the providers try to see if skills are maintained across different settings, people, and environments.

13.     Mrs. B. did not know she could disagree with the January or February 2016 ARDs. She thought that it would not matter anyways, because it was Texas State law. She believed the proposal from NISD was the best she would be able to get for R.B.

14.     Dr. Lindsay Heath completed an Independent Educational Evaluation (IEE). She was qualified as an expert in neuropsychology by the Impartial Hearing Officer (IHO). Dr. Heath testified the Full Individual Evaluation (FIR) was insufficient, as the District did not conduct formal intellectual or academic achievement testing. Dr. Heath would not have recommended reducing services.

15.     After February 2016, Mr. and Mrs. B. noticed a decline in R.B.'s behavior and reached out to The Family Resource Network and Bishop (the special education coordinator for NISD) to try and resolve the issues with the NISD. Mrs. B. requested a meeting with Vice Principal Ruiz, Davila, and the counselor. It was Ruiz's understanding that Mrs. B. wanted to talk about some concerning language that R.B. exhibited at home, specifically R.B. saying, "Stop it, stop it, don't be stupid, in the bucket, in the bucket." The conversation included bringing in a private BCBA to help on the Langley campus. At this meeting, Mrs. B. brought up her concerns with the student's behavioral issues, lack of progress towards his goals, and having a BCBA help in the classroom.

16.     R.B. regressed with toileting skills while at Langley Elementary. Mrs. B. contacted Bishop regarding issues with toileting, the language R.B. used, and communication. Parent concerns were focused on how behaviors were being addressed, such as the overuse of the computer.

17.     R.B. spit, hit, threw furniture, and screamed. These behaviors remained consistent throughout his time at Langley. No BCBAs observed R.B. in school. Davila, the special education

teacher at Langley, suggested to Mrs. B. that R.B. switch schools due to her concerns with the program at that school.

18. At Boldt, there are two teachers and two paraprofessionals in the classroom, but sometimes the paraprofessionals get pulled out.

19. At the beginning of the 16-17 school year, Mrs. B. contacted Polamares, the Director of Elementary Administration, because R.B. was having problems at Langley. Mrs. B. said R.B. was not going to return to Langley and Polamares suggested transferring to Boldt. He transferred in September of 2016.

20. R.B. has pica and chews on inappropriate things at school, like a computer keyboard, paper, tape, mulch, and hot glue.

21. Crystal Hamilton, R.B.'s private BCBA, attended the October ARD and suggested ABA strategies. Collaboration between providers is very important to ensure consistency across environments. However, nobody from Boldt followed up with Crystal.

22. An IEP is required to have baselines. The NISD referred to COR testing instead of inserting baselines in their IEPs. The first time Mrs. B. and Mr. B. heard an explanation of how to read COR testing was at hearing.

23. While at Boldt R.B. continued engaging in picking, sprawling on the floor, going to the computer when it was not his turn, inappropriate toy play, throwing toys, and inappropriate hugging. Some of these tantrums took longer than five minutes.

24. R.B. would attend to small group time for approximately 5 of the 15 minutes.

25. Dillon knows that parent brought a chewy for R.B. to use but did not know where it was. Muniz (the District OT) provided a different chewy. Despite Dillon's efforts, the correct chewy was not purchased, so Dillon made the purchase herself. Dillon only saw the OT come in and

take notes on R.B., but the OT never worked with him directly. Dillon does not know the amount of speech and language or occupational therapy services R.B. was to receive per week.

26. Dr. Heath had issues scheduling her observation for her IEE. When she finally was able to, she was only allowed by NISD to observe on field day, as school was about to end. Dr. Heath noted that if nobody was watching R.B. for a few minutes, he would engage in dangerous activities and would get into potentially dangerous situations; he required a lot of redirection.

27. Dr. Heath's recommendations included, among other things, ABA therapy to be provided in all environments, speech therapy, occupational therapy, District to hire a 1:1 aide for R.B. trained in ABA strategies, social skills training, behavior based language skill training, stop and think strategies, limiting attention for negative behavior, determining what positive reinforcement works for R.B., preferential seating, shorter assignments, frequent checks on his understanding of directions, addressing hyperactive behaviors privately, and a tablet or picture board for communications. A full list of Dr. Heath's Recommendations can be found in her evaluation.

28. At the October ARD, Parent recalls discussing that data would be collected and that another ARD would be held to decide on Extended School Year (ESY). She asked for this to be included in the deliberations. She asked for this ARD and received an email from Ms. Mechler saying that the attorneys would discuss having an ARD. This surprised Mrs. B. as she thought an ARD could be held during litigation.

29. Ms. Tara Hamilton is a Board Certified Behavior Analyst (BCBA) who was qualified as an expert in ABA. She worked with R.B. in Florida as his ABA provider, providing services at school and home for a period of one and a half years.

30. Crystal Hamilton, R.B.'s current private BCBA, has a master's degree in special education and is also a BCBA who provides ABA therapy. She was qualified as an expert in ABA

6

therapy and autism. She provided ABA therapy to R.B. through the ABA Center for Excellence.

31. Crystal Hamilton, R.B.'s current BCBA, has collaborated with teachers in NISD for other students before and is willing to provide ABA services at Boldt. The NISD does not allow outside BCBAs to come onto campus to provide services. Despite repeated questions on ABA services, Bishop, the Special Education Coordinator, did not once mention that the District had BCBAs. Mrs. B. did not ask for a BCBA at Boldt as it was already established that she could not have a private BCBA come to campus at Langley.

32. Talitha Foster was R.B.'s private occupational therapist (OT) in Florida. She has been an OT since 1996 when she received her bachelor's degree, and has taught occupational therapy at various levels for 5 years. She received her post-professional doctorate degree in OT in 2014. She was qualified as an expert in OT by the IHO.

33. Ms. Foster testified that a chewy is something used to bite on or chew safely to get input through the mouth and helps with regulation. There are thousands of different types of chewies with different textures, shapes, firmness, and vibrations. Its possible for one chewy out of thousands to be the only one that works for a particular child. Ms. Cardona stated that R.B. prefers hard, vibrating chewies. Muniz provided one chewy, but R.B. didn't use it. She is aware that there are other chewies that he may prefer but has not bought one.

34. Jocelyn Cardona is R.B.'s current private OT provider. She was qualified as an expert in OT by the IHO. The evaluation and her session notes are in evidence. She has been working with R.B. since March of 2016, with a focus on toileting. R.B. now independently toilets with her and initiates about half the time. Muniz is the NISD's OT. She has worked in the school setting for 5 years. She has no pediatric OT experience prior to working with the NISD. She graduated from school in 2002, but has not had any training on working with children with autism since.

35. R.B. scored an 11 out of 14 on his sensory profile. This means R.B. struggles with processing sensory input. If a child is overstimulated, the provider will try to desensitize him to help regulate his needs. Sensory regulation describes people's ability to take in information about our environment and use our senses to understand it.

36. Ms. Foster, R.B.'s occupational therapist in Florida, used assistive technology (AT) devices with R.B. He had a very positive experience with the weighted vest Ms. Foster provided and it was recommended that he continue to use it when he moved from Florida. He used an iPad to communicate activity choices. R.B. made great developmental progress in the nine months he worked with Ms. Foster in Florida.

37. Muniz, the NISD's occupational therapist, tried to make a weighted lap pad but R.B. did not like it. Different children require different weights for lap pads and some experimentation is required. The parents were not informed about the school trying a weighted pad. She did not try a weighted vest and she has never used a weighted vest with a student before.

38. Muniz has only spoken with Mrs. B. during an IEP meeting. In order to facilitate better communication, Mrs. B. asked for an email including Muniz, but this never occurred.

39. Muniz does not think R.B. needs OT services, did not think he needed them when his IEPs were developed, and couldn't say how her minimal services helped R.B.

## THE HEARING OFFICER'S DECISION

40. The Independent Hearing Officer (IHO) made the following conclusions of law:

    a. [The NISD] provided [R.B.] with the requisite comparable services upon transfer from a public school district in another state. *34 C.F.R. § 300.324 (f)*.
    b. [The NISD] provide [R.B.] with a free, appropriate public education through an Individualized Education Plan reasonably calculated to enable [R.B.] to make progress in light of [R.B.]'s unique circumstances and derive a meaningful educational benefit from the educational program. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1,*

*137 S.Ct. 988 (2017); Keith and Linda G. v. Waller Ind. Sch. Dist., 2017 WL 271341 (5th Cir. 2017); Cypress-Fairbanks Ind. Sch. Dist. v. Michael F., 118 F. 3d 245 (5th Cir. 1997).* [R.B.] did not meet his burden of proof on this issue. *Schaffer v. Weast, 546 U.S. 49, 62 (2005).*

c. [The NISD] provided [R.B.] with a free, appropriate education in the least restrictive environment. *34 C.F.R. § 300.114.*
d. [The NISD] provided [R.B.] with appropriate related services. *34 C.F.R.§ 300.34 (a).*
e. [The NISD] complied with all procedural requirements of the IDEA and did not significantly impede parental opportunity to participate in the educational decision- making process. *34 C.F.R. §§ 300.503; 300.504; 300.513 (a)(2)(ii).*

FIRST CAUSE OF ACTION

41. Plaintiffs repeat and reallege paragraphs 1 through 40 as if more fully set forth herein.

42. The IHO erred in ruling that the district did not wrongfully deny R.B. extended school year (ESY) services.

43. The IHO found that the District planned to convene an ARD meeting at the end of the 2016-2017 school year to discuss R.B.'s need for ESY, as discussed in the October 2016 ARD meeting, but it was never convened. She excused the District not holding this meeting by saying litigation was pending at the end of the school year and convening an ARD may be an item of negotiation between the parties at that point.

44. A District cannot use the fact that the Parents have filed for Due Process Hearing as an excuse to not have an ARD meeting and discuss ESY. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047 (9th Cir. 2012). The obligation to provide FAPE continues even as the parties are in litigation. *Id.* "It would be antithetical to the IDEA's purposes to penalize parents – and consequently children with disabilities – for exercising the very rights afforded to them under the IDEA. *See* 20 U.S.C. § 1400(d)(1)(B) (explaining that one of the IDEA's purposes is 'to ensure that the rights of children with disabilities and parents of such children are protected.')." *Id.* at 1056. But in this case, R.B. was punished by not being provided ESY because his parents were

9

involved in a due process hearing against the District. This is a clear violation of the IDEA.

## SECOND CAUSE OF ACTION

45. Plaintiffs repeat and reallege paragraphs 1 through 44 as if more fully set forth herein.

46. R.B. received Applied Behavior Analysis (ABA) services from his private provider in school in Florida. The Northside Independent School District has an illegal policy of not allowing private providers to provide services on campus. Although the District was willing to let these providers observe, it was not willing to allow these providers to provide services. Allowing these providers on campus would cost the district nothing as they are paid for by the family's private insurance. Multiple courts have held that insurance companies must pay for services at school, as that is where a student spends most of his day. *See e.g. Burke by Burke v. Independence Blue Cross,* 2017 WL 4415805 (Pa. 2017) (interpreting Pennsylvania insurance law). The delivery of ABA services in a school environement has been proven effective treatmentTricare was willing to pay for services in school in Florida, and would likely continue to provide for services in school in Texas.

47. The Hearing Officer found that because the NISD had ABA providers it did not fail to provide R.B. the services he needed. However, despite the fact that Mrs. B asked repeatedly for ABA services, the first time she found out about these district employed ABA providers was at hearing.

## THIRD CAUSE OF ACTION

48. Plaintiffs repeat and reallege paragraphs 1 through 47 as if more fully set forth herein.

49. When a student moves to a new state, the new district must provide comparable services to what was provided in the previous state until an evaluation is conducted and a new IEP is created. *Dallas Indep. Sch. Dist. v. K.W.*, 178 F. Supp. 3d 443, 462 (N.D. Tex.

2016) (internal citations omitted). The federal regulations clearly state that "if a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide the child with FAPE (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency conducts an evaluation pursuant to §§ 300.304 through 300.306 (if determined to be necessary by the new public agency); and develops, adopts, and implements a new IEP, if appropriate, that meets the applicable requirements in §§ 300.320 through 300.324." 34 C.F.R. § 300.323(f) (emphasis added); *see also* 19 Tex. Admin. Code §89.1050(j)(2).

50. The IHO in this case found that the district should have contacted the Florida school to determine whether R.B. needed a full-day or half-day of school. She further found that in this regard, the school district failed to provide R.B. with comparable services. However, she incorrectly found that this violation of the IDEA was not enough to find that the District had denied R.B. FAPE by not providing comparable services as required by law. 34 C.F.R. § 300.324(f).

51. The IHO further incorrectly found that the District provided sufficient speech and occupational therapy services during the period in which it was to provide comparable services despite there being no evidence to support such a finding.

### FOURTH CAUSE OF ACTION

52. Plaintiffs repeat and reallege paragraphs 1 through 51 as if more fully set forth herein.

53. The IHO erred in failing to address procedural violations of the IDEA, 20 U.S.C. § 1400 *et. seq.* as required. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176,

205-207 (1982); *see also D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x. 564, 567 (3rd Cir. 2012).

54. In *Rowley*, the court explained that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205. The *Rowley* court created a two-fold inquiry, (1) has the school district complied with the procedures set forth in the IDEA, and (2) has the school fulfilled its obligation to provide the student a FAPE. *Id.* at 206-207. When a parent challenges the appropriateness of an IEP, a reviewing court must first look at whether the District complied with the procedural requirements of the IDEA and only then determine whether the IEP developed through such procedures was reasonably calculated to enable the child to receive educational benefits. *Houston Indep. Sch. Dist. v. V.P. ex. rel. Juan P.*, 582 F.3d 576, 583-584 (5th Cir. 2009). A school's failure to meet these procedural requirements alone may warrant finding as a matter of law that the school has failed to provide the student a FAPE. *Jackson v. Franklin Cnty. Sch. Bd.*, 806 F.2d 623, 629 (5th Cir. 1996), *but see Buser by Buser v. Corpus Christi Indep. Sch. Dist.*, 51 F.3d 490, 494 (5th Cir. 1995).

55. The IDEA imposes "extensive procedural requirements designed to guarantee parents meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate." *Caldwell Indep. Sch. Dist. v. L.P.*, 994 F. Supp. 2d 811, 819 (W.D. Tex. 2012), *aff'd sub nom, Caldwell Indep. Sch. Dist. v. Joe P. ex. rel. L.P.*, 551 F. App'x 140 (5th Cir. 2014) (internal citations omitted) (finding that the District denied the procedural guarantees of cooperative decision-making in creating IEPs)(emphasis added); *see also Winkelman v. Parma City Sch. Dist.*, 550 U.S. 576 (2007)).

56. The IHO in this case looked at substantive violations of the IDEA before looking at the procedural, in direct violation of the test set out by the *Rowley* court. She then looked at the procedural violations more as an afterthought. The IHO incorrectly decided that the procedural violations did not matter as she saw no substantive harm to the student. The test should have stopped after looking at the procedural violation.

PRAYER FOR RELIEF

57. Plaintiffs respectfully request that this Court:

   a. Assume jurisdiction over this action;

   b. Order that the Hearing Officer applied an incorrect legal standard;

   c. Order that the Northside Independent School District violated the IDEA's provisions by failing to provide comparable services;

   d. Order that the NISD violated the IDEA by failing to hold an ARD meeting to determine ESY services;

   e. Order that the NISD violated the IDEA's provisions by not allowing R.B.'s ABA providers on campus to provide services;

   f. Award to the plaintiffs' compensatory education in the amount of $91,360.

   g. Award to the plaintiffs the costs, expenses, and attorneys' fees for the administrative proceedings pursuant to 20 U.S.C. § 1415;

   h. Award to the plaintiffs the costs, expenses, and attorneys' fees of this action pursuant to 20 U.S.C. § 1415 and 42 U.S.C. § 1988; and

   i. Grant such other relief as the Court deems just and proper.

Respectfully submitted this November 4, 2017.

Cuddy Law Firm, PLLC
8723 Shoal Creek Blvd.

Austin, TX 78747
Telephone: (512) 649-3191
Facsimile: (512) 649-1217

By: _____
Elizabeth Angelone
State Bar No. 24077349
Email: eangelone@cuddylawfirm.com
Idris Motiwala
State Bar No. 24102252
Email: imotiwala@cuddylawfirm.com